**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1125-18
A-1643-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MYKAL L. DERRY, a/k/a
MYKAC DERRY, MYKEL
DERRY, and STEVENS
MYKEL,

      Defendant-Appellant.

 

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MALIK DERRY, a/k/a
MALIK F. DERRY, and
MYKELL WATSON,

      Defendant-Appellant.

 

Submitted December 9, 2020 – Decided May 3, 2021

Before Judges Alvarez, Sumners, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 14-06-2067.

Joseph E. Krakora, Public Defender, attorney for appellant Mykal L. Derry (Frank M. Gennaro, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Malik Derry (Stephen W. Kirsch, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Daniel Finkelstein, Deputy Attorney General, of counsel and on the briefs).

PER CURIAM

Tried by a jury, defendants Malik and Mykal Derry were convicted of the murder of Tyquinn James, N.J.S.A. 2C:11-3(a)(1) and (2), and conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3. On September 26, 2018, the trial judge sentenced each defendant on the crime of murder to a term of fifty years of imprisonment subject to the No Early Release Act's (NERA) eighty-five-percent parole-bar. See N.J.S.A. 2C:43-7.2(a). A concurrent fifty-year term of imprisonment for the conspiracy conviction was also imposed, and the judge ordered $24,520 to be paid in restitution by each defendant. Defendants appeal,

and we affirm, except that we remand for the limited purpose of correcting the judgments of conviction to reflect required mergers.

Prior to the New Jersey proceedings, defendants were tried and convicted in federal court for the following crimes: conspiracy to distribute one or more kilograms of heroin (21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 860); discharging a firearm in furtherance of the conspiracy (18 U.S.C. § 924(c)(1)(A)(iii)); using a telephone to facilitate drug trafficking (21 U.S.C. § 843(b)); distribution of heroin (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)) (Mykal only); and operating a drug stash house (21 U.S.C. § 856) (Mykal only). United States v. Derry, 738 Fed. Appx. 107, 110 (3d Cir.), cert. denied, 139 S. Ct. 390 (2018). The federal judge sentenced defendants to an enhanced term of life imprisonment because defendants caused James's death.

Pre-trial, defendants moved unsuccessfully to dismiss the indictment on statutory and double jeopardy grounds, arguing that their federal convictions and enhanced sentences were based on the same facts as this case. The judge denied the motion because the federal prosecution did not include charges of murder or conspiracy to commit murder.

Also prior to trial, Malik filed a motion to bar the use of Mykal's federal testimony in which he admitted to killing James, claiming he did so because the

A-1125-18

two had a dispute over a girl, not because he was involved in a drug conspiracy. Malik did not cross-examine Mykal at the federal trial, and he argued that admitting the evidence (1) would violate his right to confront Mykal as a witness and (2) did not fall within the N.J.R.E. 804(b)(1)(A) prior testimony hearsay exception because he did not have a similar reason to cross-examine Mykal in the federal trial. The court denied that application, finding Mykal's testimony admissible under N.J.R.E. 804(b)(1)(A) on the basis that Malik had a sufficiently similar motive to cross-examine at the federal trial, and that his right to confront witnesses was not violated because his strategic decision not to cross-examine Mykal was voluntary.

Malik also unsuccessfully challenged the admission under N.J.R.E. 803(b)(5) (statements made in furtherance of a conspiracy) of certain text messages between himself and Mykal, claiming that they were not relevant to that purpose. The court disagreed.

During trial, both defendants objected to Federal Bureau of Investigations (FBI) Special Agent Christopher Kopp's testimony regarding the meaning of slang terms used in conversations overheard during a federal wiretap of defendants' phones. They argued that since the State had not offered Kopp as

4

an expert witness, his opinion testimony was improper. The court found Kopp's interpretations admissible as lay opinion testimony.

Mykal sought to call a witness, Romeo Ramone, to challenge Kopp's credibility in general, however, at a hearing outside the jury's presence, Ramone invoked his Fifth Amendment privilege against self-incrimination and offered little information. The court therefore excluded his testimony as irrelevant to any significant issue.

Prior to the judge's final charge, defendants moved for a mistrial on the ground that a juror had engaged in outside research on the case and had presumably shared the information with other jurors. After individually questioning each juror, the judge removed the individual who conducted the research and another who may have answered dishonestly. Finding that this corrected the problem created by the misconduct, the court denied defendants' motion for a mistrial.

The killing was captured by surveillance cameras located in front of two retail establishments, a liquor store and a restaurant. At approximately 7:38 p.m. on February 10, 2013, James was shot three times by a man wearing a mask, hood, and coat.

A-1125-18

The medical examiner testified the manner of death was homicide by multiple gunshot wounds. One bullet pierced James's forehead above the left eyebrow, another entered the left earlobe, and a third pierced the mid-portion of the back, travelling through the lung and liver.

The FBI had been conducting wiretaps of defendants' conversations from October 2012 through March 2013. Kopp testified that during that time, he listened to approximately 7000 calls, becoming familiar with the different voices, and code or slang terms used. He was called in just before 8:00 p.m. on the night of the murder to listen to defendants' phone calls. Because they are consequential to the State's case and the legal challenges which follow, we reproduce them at some length.

Kopp testified that at 7:09 p.m., Malik called Mykal and said: "Come around [the apartment complex] right now because this [n***a's] around here too, you hear." Mykal asked: "Who?" and Malik responded: "Ol' boy. The white boy." Again, Mykal asked: "Who?" and Malik said: "Umm, T.Y." "T-Weeze." Mykal replied: "Where at?" and Malik answered: "Yeah. [location of murder]." Mykal said: "All right. I'm going to try to pass through."

Kopp testified that the name mentioned in the conversation was an apartment complex and that James's nicknames were T.Y. and T-Weez. When

A-1125-18

someone said they were going to "slide past" they meant that they were going to go to or go by a certain location.

At 7:28 p.m., Mykal called Malik and said: "Yo, Lik. Yo." Malik apparently answered the call but did not respond. Kopp testified that "Lik" was Malik's nickname.

One minute later, Mykal called Malik again. Malik answered: "Yo, where you at?" Mykal answered: "I'm in the parking lot. Where you at? In what parking lot?" Malik replied: "Umm, [the location of the murder]." Mykal said: "Stay right there because that [n***a] right in front of [location of the murder], you hear?" Malik replied: "I know," and Mykal said: "All right. Go in back of [location of the murder] parking lot." Malik said: "I'm right here, bro."

At 7:33 p.m., Mykal asked Malik: "Where you at, man?" Malik answered: "I'm in the back of [location of the murder], bro, fuck." Mykal replied: "Come over here, right where these trucks at right here in this other parking lot." Malik said: "Oh, all right."

At 7:37 p.m., Mykal called Shaamel "Buck" Spencer, who Kopp said was Mykal's close friend, and told Spencer to "[t]urn that scanner on." After an indiscernible statement, Mykal said: "You already fuckin' know." Spencer replied: "Oh, yeah." Mykal said: "Lik just splashed T.Y." and Spencer asked:

7

A-1125-18

"He did?" Mykal answered: "Yeah, that [n***a's] gone." Kopp testified that when Mykal told Spencer to "turn that scanner on," he believed that Mykal was asking Spencer to use a smart phone application "that was a scanner for police radio communications."

At 7:41 p.m., Mykal called Kimberly Spellman, who was then pregnant with his child. She lived four or five blocks away from the murder location. Mykal asked her: "You good?" She said: "Let me use -- use the bathroom real fast, all right?" He replied: "Then come back, get me." She said: "All right."

At 7:43 p.m., Mykal called Malik, and Malik said to him: "She said she comin' right back." Mykal said: "I know. You good?" Malik replied: "Yeah. I'm Gucci." "Why? Where you at? Nah, that's all right. I'll see you later." Kopp testified that "Gucci" meant "good."

At 7:52 p.m., Spellman called Mykal, and Mykal asked her: "You out there?" She replied: "Yeah."

At 7:55 p.m., Mykal sent Malik a text that said, "change up." Two minutes later, Mykal texted Spencer: "Iz he man dwn?" Kopp testified that "man dwn" referred to a man who had been shot. Spencer replied: "I'm tryin' a get my scanner to work now." Mykal replied: "I think he is Lik, my [n***a]." Spencer responded: "Caught dat ass slippin'." Kopp testified that here "slippin'" was

A-1125-18

used to refer to a shooting; "it would refer to the person who had been shot at that they had . . . had been caught slipping." Mykal wrote: "Word. I lined 'em n . . . the crazy part, bitch [n***a] was grillin' me before he got splashed." Kopp testified that when someone set another person up to be the victim of a shooting, the phrase "lined 'em up" was used to refer to the set up. Spencer replied: "ha, ha, ha, ha."

At 8:09 p.m., Mykal called Malik and told Malik: "Not too much talkin', bro. You hear (indiscernible word)." Malik said: "I know," and Mykal said: "All right. I'll be there to get you in probably like an hour."

At 8:31 p.m., Spencer texted Mykal: "Man dwn."

At 8:46 p.m., Mykal called Malik. Mykal asked Malik where he was, and Malik answered: "I'm in the trap." Mykal replied: "Hey, yo. I'll be over there, you hear me?" Kopp said "the trap" referred to a residence five or six blocks away from the murder location.

At 8:53 p.m., Terry "Mace" Davis, another of Mykal's friends, called Mykal. Mykal asked Davis: "Y'all still in the hood?" Davis replied: "Yeah. We got the room at the Taj." Mykal asked: "You at the room?" and Davis replied: "Nah, we -- we in the hood, but we got the room at the Taj." Mykal said: "Hey, I'm 'bout to come back around there. Who got the room, you know."

9

Davis replied: "Yeah. We all put up though. You know, we all got the room."

Mykal responded: "All right. Yeah, we need somebody to spot, to squat at, 'bout come around." Davis said: "Yeah. You already know shit. That's why we grabbed that. But I got my own -- what (indiscernible few words), umm, that mother fuckin', 'bout what I think, whatever that shit called. I got -- I got my own little shit --" Mykal asked: "When y'all goin' up there?" Davis said: " -- in Best Western. I got shit at the Best Western already you heard?" Mykal said "I might come around, you hear that?" Davis said: "All right. Hit the phone when you get by the door."

At 9:03 p.m., Malik called Mykal, and Mykal said: "Yo, I'm comin' now, bro." Mykal asked him where he was and if he was "in the crib." Malik replied: "Uh, I'm in. Damn, they spinnin' this shit . . . they spinnin' the hood." Mykal asked: "Who squally?" Malik replied: "Yeah. They just came to the crib." Mykal asked: "What crib," and Malik replied: "The crib I told you I was at." Mykal asked: "Why they come there?" and Malik replied: "I don't know (indiscernible) . . . . Come on, bro, where you at?" Mykal said: "Yo, Lik" and Malik said: "Come get me." Mykal again asked Malik where he was, and Malik said: "In the second." Mykal said: "All right. Stay right there." Kopp said that "spinnin" referred to someone who was driving around an area. Kopp

10 <span>A-1125-18</span>

testified "squally" meant police.  "In the second" referred to the second village of a city public housing project, and "one of the traps" was a specific address, a drug house.

At 9:05 p.m., Mykal called Malik, and Malik asked him where he was. Mykal replied:  "I'm almost at the second."  Malik told him to "pull up" at "Kentucky and Drexel."  Kopp testified that "Kentucky actually splits [the original public housing project] in half and . . . Drexel Avenue splits the second village in half."  That location was approximately one block away:  "It's just across the courtyard."

At 9:11 p.m., Mykal called another friend, Kasan Hayes.  During that conversation, Davis took the phone from Hayes and spoke with Mykal.  The three of them talked about "the room" and who had keys to it.  Davis said he had the keys, and then Mykal said:  "All right.  'Cause me and Lik we tryin' dip you hear?  Matter fact, I'm going to just come back.  I'm gonna come back you hear? I'm gonna drive for a minute and come back you hear, my [n***a]?  Cause it's hot around here."  Kopp explained that "dip" meant leave and that a "hot area" was one with a police presence.

At 10:44 p.m., Mykal texted yet another friend, Tyrone Ellis:  "Yo, you somewhere . . . where it's cable?  Watch the news for me, bra."

11

At 11:08 p.m., Spellman texted Mykal: "First homicide of da year, head shot." Two minutes later Mykal responded: "He [presumably Malik] gud, he acting like it's nothn'. CTFU." Kopp said CTFU was an abbreviation for "crackin' the fuck up." At 11:21 p.m., Mykal texted her: "This [n***a] iz a true Derry."

On cross-examination, Kopp acknowledged that "numerous attempts" to take James's life had been made. None of those attempts involved Malik, however. Before James was shot, he had been back and forth in front of the businesses at the murder location for some time, and other people were in the area.

On February 11, 2013, law enforcement searched Spellman's home, locating a gun hidden in the drop ceiling. Law enforcement had seen Mykal and Spellman enter the residence at various times between December and January. They had not seen Malik enter the home, nor had they seen Mykal enter, on February 10 or 11. They also had seen Mykal drive a white Chevy Malibu.

New Jersey State Police Detective Christopher Clayton, then assigned to the Ballistics Unit, testified as the State's firearms expert. He examined the handgun found in Spellman's home in the drop ceiling and test-fired the weapon. After comparing discharged shells with the bullets recovered from James's body

and the shell casings found at the scene, he determined they were fired from that handgun. No fingerprints were found either on the gun or the bullets.

Defendants were arrested and their cell phones were seized.

Atlantic County Prosecutor's Office Sergeant Ian Joseph Finnimore testified that Malik was "substantially taller" than Mykal. Malik was around six feet three-to-five inches, and Mykal was less than six feet in height. The two stood for the jury.

At the prior federal proceeding, defendants gave statements, which were read into evidence. In Malik's statement, he said that Mykal had "nothing to do with nothing" and that he wanted the court to "let [Mykal] go."

Mykal said in his federal statement that Malik "was in all those calls" that Kopp listened to and that he had personal problems with James and Sedrick "Sed" Lindo. He had planned to kill James and Lindo because they had shot at him. He did not get the chance to kill Lindo because someone else killed him first, but he shot and killed James. Mykal said he rode up to James on a bike and shot him in the head with the gun found in the ceiling of Spellman's home.

Mykal also said that just before the shooting, Malik had called and told him where James could be found. Malik did not know that Mykal was going to kill James, but Malik knew that he had a problem with James. Mykal explained

Lindo and James had tried to kill him in front of his son, so he planned to kill both of them. His problem with Lindo was over a woman named Tasha whom they had been involved with in 2011.

Mykal claimed the voices on the call that Kopp listened to were his and Malik's, and that he had the handgun with him when Malik called to tell him where James was. Just before the shooting, he was driving a white rental car at the Showboat casino. He parked the car, got the bike from Malik, and then rode it to the location where he killed James. He lied to Spencer and said "Lik just splashed T.Y." to make Malik "look tough." After the shooting, Mykal said he went to the public housing project, and Spellman picked him up.

When he asked Spencer if James was "man dwn," Mykal was asking if James was dead, and Spencer told him he had to use his scanner to try to find out if police were investigating. Spellman then sent him a text saying it was the first homicide of the year, his reply of "CTFU" meant "crackin the fuck up." Mykal said he had lied to Spellman and led her to believe that Malik did the shooting. He was referring to Malik when he said "He gud, he acting like nothn."

Mykal also told Ambrin Qureshi that Malik was the shooter, and that Malik was going to take the rap for the crime. Mykal said Spellman did not know he put the gun in the drop ceiling of her home.

14

We discuss additional facts developed during the trial in the relevant section of the opinion, and combine defendants' points for purposes of our discussion. Malik raises the following on appeal:

POINT I

THE JUDGE IMPROPERLY DENIED DEFENDANT'S REQUEST TO DISMISS THE MURDER AND CONSPIRACY CHARGES PURSUANT TO N.J.S.A. 2C:1-3F; DEFENDANT WAS FULLY AND COMPLETELY PUNISHED VIA A FEDERAL PROSECUTION THAT RESULTED IN A LIFE SENTENCE FOR COMMITTING MURDER IN THE FURTHERANCE OF A FEDERAL DRUG CRIME, AND NEW JERSEY HAD NO LEGITIMATE PENAL INTEREST IN A STATE PROSECUTION FOR THAT SAME MURDER.

POINT II

THE JUDGE VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS TO CONFRONTATION AS WELL AS N.J.R.E. 804(B)(1)(A) WHEN, OVER OBJECTION, HE ADMITTED TESTIMONY OF THE CODEFENDANT FROM A FEDERAL CASE IN WHICH THE DEFENDANT'S COUNSEL DID NOT CROSS-EXAMINE THE CODEFENDANT BECAUSE HE DID NOT HAVE THE SAME MOTIVE TO CROSS-EXAMINE HIM AT THAT TRIAL AS HE WOULD HAVE HAD IN THIS TRIAL.

POINT III

OVER OBJECTION, THE JUDGE IMPROPERLY ADMITTED AGAINST THE DEFENDANT ALL OF

15

THE TEXT MESSAGES AND RECORDINGS OF PHONE CALLS INVOLVING THE CODEFENDANT UNDER THE THEORY THAT THEY ALL WERE MADE "IN FURTHERANCE OF" A CONSPIRACY UNDER N.J.R.E. 803(B)(5), WHEN, IN FACT, THE RULE AND THE CASE LAW PLAINLY EXCLUDE STATEMENTS MADE MERELY "ABOUT" A CONSPIRACY, RATHER THAN "IN FURTHERANCE OF" IT.

POINT IV

OVER OBJECTION, THE STATE IMPROPERLY CALLED A LAY OPINION WITNESS TO TESTIFY TO THE MEANING OF SLANG TERMS USED BY THE DEFENDANT AND OTHERS IN INTERCEPTED PHONE CALLS AND TEXTS, WHEN THE CASE LAW AND N.J.R.E. 701 ARE CLEAR THAT ONLY EXPERT TESTIMONY IS APPROPRIATE TO INTERPRET SLANG UNLESS THE WITNESS IS A PARTICIPANT IN THE CONVERSATION, WHICH THIS WITNESS WAS NOT.

POINT V

THE MATTER SHOULD BE REMANDED FOR A RESTITUTION HEARING; NO FINDING WAS MADE OF DEFENDANT'S ABILITY TO PAY THE LARGE RESTITUTION ORDER.

Mykal asserts the following:

POINT ONE:

DEFENDANT'S MOTION TO DISMISS THE INDICTMENT PURSUANT TO N.J.S.A. 2C:1-3f

16

AND N.J.S.A. 2C:1-11 WAS WRONGFULLY DENIED.

POINT TWO:

SPECIAL AGENT KOPP OFFERED INADMISSIBLE LAY OPINION INTERPRETING INTERCEPTED CONVERSATIONS.

POINT THREE:

THE TRIAL COURT UNDULY PREJUDICED DEFENDANT BY EXCLUDING THE TESTIMONY OF DEFENSE WITNESS ROMEO RAMONE.

POINT FOUR:

THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION FOR A MISTRIAL DUE TO JURY MISCONDUCT.

POINT FIVE:

THE SENTENCE OF [FIFTY] YEARS SUBJECT TO THE NO EARLY RELEASE ACT WAS EXCESSIVE.

I.

Defendants contend that, in light of their federal convictions and sentences, the court erred in denying their motions to dismiss the indictment. They argue that the underlying facts in both prosecutions were the same, and the enhanced federal sentence of life imprisonment punished them for causing James's death.

17

Two statutes address the dismissal of an indictment based on a prior prosecution, namely, N.J.S.A. 2C:1-3(f) and N.J.S.A. 2C:1-11. N.J.S.A. 2C:13(f) relates to dismissal of New Jersey prosecutions where a defendant has been prosecuted in "another jurisdiction," including another state, while N.J.S.A. 2C:1-11 requires dismissal where a defendant has been prosecuted for the same conduct by the federal government. State v. Gruber, 362 N.J. Super. 519, 528 (App. Div. 2003) (discussing State v. Goodman, 92 N.J. 43, 51-53 (1983)); see also Cannel, New Jersey Criminal Code Annotated, cmt. 6 on N.J.S.A. 2C:1-3 (2020).

In relevant part, N.J.S.A. 2C:1-3(f) provides:

> [T]he court may dismiss, hold in abeyance for up to six months, or, with the permission of the defendant, place on the inactive list a criminal prosecution under the law of this State where it appears that such action is in the interests of justice because the defendant is being prosecuted for an offense based on the same conduct in another jurisdiction and this State's interest will be adequately served by a prosecution in the other jurisdiction.
>
> [N.J.S.A. 2C:1-3(f).]

In relevant part, N.J.S.A. 2C:1-11 provides:

> When conduct constitutes an offense within the concurrent jurisdiction of this State and of the United States, a prosecution in the District Court of the United

States is a bar to a subsequent prosecution in this State under the following circumstances:

a. The first prosecution resulted in . . . a conviction . . . and the subsequent prosecution is based on the same conduct, unless (1) the offense of which the defendant was formerly convicted . . . and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil or (2) the offense for which the defendant is subsequently prosecuted is intended to prevent a substantially more serious harm or evil than the offense of which he was formerly convicted . . . .

[N.J.S.A. 2C:1-11.]

We review a trial court's application of a statute under the de novo standard of review, and a court's discretionary decision under N.J.S.A. 2C:1-3(f) for abuse of discretion. Gruber, 362 N.J. Super. at 527.

In this case, defendants relied on both statutes in support of their motions to dismiss the indictment. The trial court denied the motions on the ground that defendants were not prosecuted for murder in federal court, as they only received an enhanced penalty. He opined that the distinction was dispositive.

Defendants continue to take the position that the court should have exercised its discretion and granted the motion to dismiss because the federal prosecution and life sentence fully served the State's interest. Their federal

19

convictions and sentences are final, as the Third Circuit affirmed both, and the Supreme Court denied certiorari. Derry, 738 Fed. Appx. 107, cert. denied, 139 S. Ct. 390 (2018). Mykal also argues that the court should have dismissed the indictment under N.J.S.A. 2C:1-11 because the state prosecution was based on the same conduct as the federal prosecution.

The argument that relies on N.J.S.A. 2C:1-3(f) must fail. Defendants were not prosecuted for the killing. Thus, they would suffer no unfairness from "multiple prosecutions." Gruber, 362 N.J. Super. at 528.

The judge also properly denied the motion filed under N.J.S.A. 2C:1-11 because the crimes for which defendants were prosecuted in federal court did not include murder and conspiracy to commit murder. Conviction of the crimes in federal court did not require proof of an intentional killing.

That the federal conviction resulted in an enhanced penalty based on James's death does not bar this prosecution. See State v. Walters, 279 N.J. Super. 626, 631 (App. Div. 1995) ("Prosecutions resulting in convictions in which sentencing is enhanced in the federal courts simply do not bar subsequent prosecution of the alleged offense in this State" under N.J.S.A. 2C:1-11). Simply stated, the crimes for which defendants were prosecuted in federal court included neither murder, "a substantially more serious harm or evil," nor

conspiracy to commit murder. They did not require proof of an intentional killing. See N.J.S.A. 2C:1-11.

## II.

Malik contends the court erred in admitting Mykal's federal trial testimony against him. He asserts the testimony denied him the right to confront witnesses and should have been excluded under N.J.R.E. 804(b)(1)(A) (prior testimony of an unavailable witness) because he did not cross-examine Mykal at the federal trial, where his motive to do so was not similar to his motive in this case.

Mykal was unavailable to testify at the state trial because of his privilege against self-incrimination. Malik, however, had the opportunity to cross-examine Mykal at the federal trial.

Even if the court admitted the testimony in error, the error was harmless in light of the significant evidence of guilt otherwise introduced. Moreover, because Malik could have cross-examined Mykal at the federal trial, the admission of the testimony did not violate his right to confront witnesses.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution afford an accused in a criminal case the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. The Confrontation Clause prohibits the use

21

of out-of-court testimonial statements when the defendant did not have the opportunity to cross-examine the witness on the statement. State in the Interest of J.A., 195 N.J. 324, 351 (2008) (discussing Crawford v. Washington, 541 U.S. 36, 51-52 (2004)). Thus, to establish a Confrontation Clause violation, a defendant must show that he or she was denied the opportunity to cross-examine a witness who provided a testimonial statement. State v. Nyhammer, 197 N.J. 383, 414 (2009).

The Confrontation Clause does not preclude all forms of hearsay from being used as evidence at trial. State in the Interest of J.A., 195 N.J. at 342. "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" State v. Branch, 182 N.J. 338, 357 (2005) (quoting N.J.R.E. 801(c)). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802.

N.J.R.E. 804(b)(1)(A) provides an exception to the hearsay rule for prior testimony of an unavailable witness:

> Subject to Rule 807 [discretion of court to exclude evidence under certain exceptions], the following are not excluded by the hearsay rule if the declarant is unavailable as a witness.
>
> (1) Testimony in Prior Proceedings.

22

> (A) Testimony that: (i) was given by a witness at a prior trial of the same or a different matter, or in a hearing or deposition taken in compliance with law in the same or another proceeding; and (ii) is now offered against a party who had an opportunity and similar motive in the prior trial, hearing or deposition to develop the testimony by examination or cross-examination.
>
> [N.J.R.E. 804(b)(1)(A).]

Where a witness asserts the privilege against self-incrimination, the court may find him or her unavailable for purposes of N.J.R.E. 804(b)(1)(A). State v. McInerney, 450 N.J. Super. 509, 512 (App. Div. 2017).

We review an evidentiary hearsay ruling under the abuse of discretion standard, affording no deference to questions of law. Ibid. Under the abuse of discretion standard, the trial court's ruling will not be disturbed unless it "was so wide of the mark that a manifest denial of justice resulted." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). Where admission of evidence under a hearsay exception results in a Confrontation Clause violation, however, the evidence must be excluded. Branch, 182 N.J. at 369-70.

At trial, Malik argued that Mykal's federal trial testimony was inadmissible because he had no motive to cross-examine him at the federal trial

and did not do so. Because the charges differ in the State trial, he contends his motive to cross-examine is also different. Malik asserts that Mykal's testimony was highly prejudicial because he admitted to shooting James and conspiring with Malik to do so.

The trial judge found Mykal's testimony admissible, reasoning that while the federal and state cases were different, they bore similarities, and Malik had the opportunity to cross-examine Mykal. That Malik chose not to do so did not alter the fact that he had the option to cross-examine.

Malik points out that in the federal case, defendants were charged with discharging a weapon in furtherance of a drug conspiracy, and that discharging the weapon to settle a dispute over a girl, as his brother claimed, was a defense to the charge. In the state prosecution, however, Mykal's testimony served as an admission, implicating Malik in the conspiracy to kill James. Thus, Malik's motivation to cross-examine Mykal was different. That the motive was different does not nullify the fact that the option existed. See Nyhammer, 197 N.J. at 414 (explaining that a confrontation clause challenge requires a showing that the defendant was denied the opportunity to cross-examine a witness who provided a testimonial statement).

Were we to accept, which we do not, that the court abused its discretion in concluding that the motive was similar and admitting the statement, the error would be harmless. The evidence against defendants was overwhelming. Defendants' recorded phone conversations and text messages demonstrate that they planned the murder after locating James, and then took orchestrated steps to avoid detection. Police also found the gun used to kill James at Mykal's girlfriend's home. Admission of Mykal's testimony was not "clearly capable of producing an unjust result." See R. 2:10-2.

## III.

During the 104 hearing, Ramone refused to answer most questions, asserting his Fifth Amendment privilege against self-incrimination. He denied that he had ever attempted to kill James, and refused to answer questions regarding whether James had been sexually involved with the woman Mykal claimed was the reason for his conflict with James.

Contrary to Mykal's arguments on appeal, Ramone's very limited testimony would not have established third-party guilt, nor would it have impeached Kopp's and Atlantic County Prosecutor's Office Detective Michael Graham's credibility because Ramone said he acted as their informant. The

judge agreed with the State, refusing to allow Ramone to testify because he had no relevant information to offer with respect to the issues before the jury.

Mykal's position that Ramone's testimony was relevant to the officers' credibility, and denied him the ability to present a complete defense, does not warrant discussion in a written opinion. R. 2:11-3(e)(2). To the minimal extent his testimony may have impacted Kopp's credibility in general, the probative value was outweighed by the risk the testimony would confuse or mislead the jury. See N.J.R.E. 403(a).

IV.

Malik contends that the court erred in admitting, pursuant to N.J.R.E. 803(b)(5) (statements made in furtherance of a conspiracy), a number of the text messages sent just after the shooting, reasoning that the conspiracy was complete by that point. (Mab29-Mab33; Malik's point III). The texts proved the conspiracy to commit murder, however, because they included discussions regarding flight in order to avoid detection.

N.J.R.E. 803(b) sets forth hearsay exceptions for certain statements made by a party-opponent. Section (5) includes "a statement made at the time the party-opponent and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan." N.J.R.E.

26

803(b)(5).  Where a defendant objects to testimony under this rule, the State must show the statement was "made in furtherance of the conspiracy" and "during the course of the conspiracy."  State v. Savage, 172 N.J. 374, 402 (2002) (quoting State v. Phelps, 96 N.J. 500, 509-10 (1984)).  Statements made in furtherance of flight fall within the N.J.R.E. 803(b)(5) exception.  Id. at 403.

Malik contends that the following text messages were inadmissible under this exception because they were not made in furtherance of the conspiracy to avoid detection, but were merely "about" the shooting:

1.    Mykal's text to Spencer that "Lik just splashed T.Y."

2.    Spencer's text to Mykal asking "Iz he man dwn?"

3.    Spencer's text:  "Caught dat ass slippin'"

4.    Mykal's text to Spencer:  "Word.  I lined 'em n . . . the crazy part, bitch [n***a] was grillin' me before he got splashed"

5.    Spencer's reply of "ha, ha, ha, ha"

6.    Spencer's text to Mykal:  "Man dwn"

7.    Spellman's text to Mykal:  "First homicide of da year, head shot"

8.    Mykal's reply that he was "ctfu" and that Malik was "a true Derry"

A-1125-18

The court found the statements in furtherance of the conspiracy and therefore admissible under N.J.R.E. 803(b)(5). The court did not elaborate, but accepted the prosecutor's argument that the statements were made in an effort to avoid detection.

The statements clearly implicate both defendants, who are co-conspirators. In the texts, Mykal informs Spencer that Malik had just shot and killed James, thus explaining his request that Spencer listen to his police scanner to keep him informed of police activity. Mykal later contacted Spencer to find a ride for Malik. These eight messages were not distinct and separate from the conversations more explicitly about avoiding detection. They were included in the ongoing effort to flee from the authorities. See State v. Soto, 340 N.J. Super. 47, 62 (App. Div. 2001) ("A statement is considered to have been made in the course of a conspiracy even when the [underlying] crimes [of the conspiracy] have been completed, as long as all of the conspiracy's objectives and goals have not yet been met."). Thus, the judge did not abuse his discretion in admitting the statements. See Phelps, 96 N.J. at 510 ("Since coconspirators are substantively liable for the acts of their coconspirators in furtherance of the common plan, so too should they be responsible for statements uttered by coconspirators to further that plan.").

V.

Defendants contend that the judge erred in relying on N.J.R.E. 701 (opinion testimony of a lay witness) when he allowed Kopp to testify regarding the definitions of slang terms used in defendants' recorded telephone calls and seized text messages. The rule states: "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. Although we agree with defendants, ultimately the error is harmless because Kopp would have qualified as an expert.

A law enforcement officer ordinarily may not offer lay opinion testimony on the meaning of slang terms unless he was an actual participant in the conversation, and based his understanding of the terms on personal perception. State v. Hyman, 451 N.J. Super. 429, 450 (App. Div. 2017) (discussing State v. McLean, 205 N.J. 438, 458-59 (2011) and State v. Johnson, 309 N.J. Super. 237, 244 (App. Div. 1998)). When based on the officer's "training and experience and knowledge of [an] investigation," the opinion is more accurately characterized as an expert opinion. Hyman, 451 N.J. at 448-49 (quoting McLean, 205 N.J. at 456 and explaining that an officer's opinion does "not

become a lay opinion because [the officer] heard the wiretaps with his own ears, any more than a non-treating physician's diagnosis becomes a lay opinion because the physician's own hands were used to conduct an independent medical examination.").

N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To be admissible under this rule,

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the subject of the testimony must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
>
> (3) the witness must have sufficient expertise to explain the intended testimony.
>
> [State v. Harvey, 151 N.J. 117, 169 (1997).]

Where the court erroneously admits as lay opinion testimony, as opposed to expert testimony, an officer's interpretation of the meaning of slang, the error will be harmless if the officer would have qualified as an expert and the inadmissible lay opinion testimony was unlikely to affect the outcome. Hyman,

451 N.J. Super. at 458 (quoting State v. J.R., 227 N.J. 393, 417 (2017) for the proposition: "Convictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result.").

Kopp testified to his understanding of the meaning of the parties' slang in the wiretap conversations, based on his training, experience and knowledge of the underlying investigation, not his participation in the conversations. Thus, his opinion should have been offered as expert opinion testimony. Hyman, 451 N.J. Super. at 448-49. The admission was harmless error, however, because Kopp's experience and training would have qualified him as an expert. See id. at 458.

Kopp had been an FBI agent for twelve years and had served as a police officer in Arizona for five-and-one-half years prior to that. With respect to this wiretap, which lasted from October 2012, until late March 2013, and included approximately 7000 calls, Kopp testified he had developed familiarity with the individuals' voices, and the slang or code terms they used. Throughout his testimony interpreting the slang, he testified that his understanding of the terms used was based on his experience. Kopp would have qualified as an expert

witness. The court's error in admitting his testimony as lay opinion was therefore harmless.

## VI.

Mykal contends the court erred in denying his motion for a mistrial based on jury misconduct. "A mistrial should only be granted 'to prevent an obvious failure of justice.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). In deciding the motion, "trial courts must consider the unique circumstances of the case." Ibid. If there is "an appropriate alternative course of action," the court should deny the motion. Ibid. (quoting State v. Allah, 170 N.J. 269, 281 (2002)). The decision to grant or deny a mistrial is within the trial court's discretion and will not be disturbed on appeal "absent an abuse of discretion that results in a manifest injustice." Ibid. (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

In this case, the juror misconduct issue arose after summations but before the court instructed the jury. Juror number four notified the court that juror number seven had said that she had researched the case on the internet. Juror number four believed that juror number one may have overheard the conversation.

The court then called each juror to sidebar and asked whether: anyone had approached them about the case or discussed the case with them; they had done any research of the case on their own; and anything had happened to cause them concern. All jurors except number four answered "no" to the questions. Defense counsel noted for the record that juror number one had "lowered his eyes" when the court asked about research.

Juror number four explained to the court that while she and the other jurors were sitting in the jury assembly room, juror number seven had told her that she had researched "the trial of the defendants and the attorneys." Juror number four said: "I was just so taken back, I just picked up my phone and started texting my girlfriend and daughter to the point where she could feel my uncomfortableness." Juror number seven then said, "I probably should have never said that" and stood up and walked away.

The conversation made juror number four feel "so conflicted" in light of the oath she had taken as a juror that she discussed the incident with her family that night. She did not discuss the case with her family; she only discussed the juror who had said she had done research. She also did not know what juror number seven's research had revealed, since she quickly ended the conversation. Juror number one had been sitting next to juror number seven at the time, but

33

juror number four did not know whether juror number one had overheard the conversation. Juror number four said the incident did not affect her ability to render a fair verdict based on the evidence.

The court denied defendants' motion to remove jurors number one, four, and seven. The judge, however, excused jurors number one and seven, finding juror number four credible. The judge further found juror number four had displayed good faith in reporting the incident and there was no basis upon which to excuse her. In his opinion, she maintained her ability to remain impartial and decide the case based on the facts presented at trial.

The court did not abuse its discretion in declining to remove juror number four or declare a mistrial. Nothing in the record suggests the entire jury panel was tainted by juror number seven's conduct. The judge chose an "appropriate alternative course of action." See Smith, 224 N.J. at 281.

## VII.

The judge did not impose an extended term, as the State requested, upon Mykal because no benefit would be gained given his federal sentence, nor would there be a basis to impose a consecutive term to that life sentence. Mykal contends on appeal that his aggregate sentence of fifty years imprisonment is manifestly excessive.

In weighing the aggravating and mitigating factors, a trial court must conduct a qualitative, not quantitative, analysis. State v. Kruse, 105 N.J. 354, 363 (1987). Where an element of the offense is encompassed within an aggravating factor, the court may not "double-count" that element by finding the aggravating factor. State v. Fuentes, 217 N.J. 57, 74-75 (2014); State v. Kromphold, 162 N.J. 345, 353 (2000). The court must state the reasons for the sentence, including its findings on the aggravating and mitigating factors. N.J.S.A. 2C:43-2(e); R. 3:21-4(g). A sentence should only be disturbed when the trial court failed to follow the sentencing guidelines, when the aggravating and mitigating factors are not supported by the evidence, or when application of the guidelines renders a sentence clearly unreasonable. State v. Roth, 95 N.J. 334, 364-65 (1984). The facts and law must show "such a clear error of judgment that it shocks the judicial conscience." Id. at 364.

In sentencing Mykal, the judge found aggravating factors three, six, and nine based on Mykal's fifteen prior arrests between 1998 and 2013, and seven convictions, five of which were for state indictable offenses, and one of which was for a federal crime. Mykal had served four prior prison terms. Thus, the judge imposed the fifty-year term of imprisonment and ordered Mykal to pay

$24,520 in restitution, recognizing that while he had no current income, the debt should be repaid if he were ever to "hit the lottery or come into an inheritance."

Mykal's argument that the sentence is excessive because the federal sentence adequately punished him for the underlying crime lacks merit. Since he was properly convicted in the two separate courts for two different crimes, it would not follow that the federal sentence satisfied the penal objectives of our murder statute. The court's findings on aggravating factors were supported by the record. The term imposed was within the range. See N.J.S.A. 2C:11-3(b)(5).

We note, however, that the judge separately sentenced Mykal on the conspiracy count. Since the only goal of the conspiracy was the murder, merger is appropriate. See State v. Grunow, 102 N.J. 133, 147 (1986); State v. Hardison, 99 N.J. 379, 386-91 (1985). The same error should be corrected as to Malik.

Malik also contends that the court erred in requiring him to pay restitution without conducting a hearing at which his ability to pay could be determined and without spelling out any rationale for the imposition. Restitution, which the judge found should be "joint and several" between the two defendants, was to be paid to the Victim Violent Crimes Compensation Office and not to the victim's family directly because payments had already been advanced to them.

Restitution is within the court's discretion and will not be reversed on appeal unless the reviewing court finds an abuse of discretion. State v. Harris, 70 N.J. 586, 599 (1976); State v. Martinez, 392 N.J. Super. 307, 318-19 (App. Div. 2007). As the judge acknowledged, neither defendant would have the ability to pay restitution unless they unexpectedly came into money. Under the circumstances, given that defendants are serving life sentences, and are compensating the Board as required by statute, no remand hearing is necessary. See N.J.S.A. 2C:44-2(b)(2).

Affirmed, except remanded to correct the judgment to reflect that the conspiracy convictions merge with the substantive crime of murder.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1125-18